**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JOYCE CLINTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| LINCOLN NATIONAL LIFE INSURANCE COMPANY, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT**

COMES NOW Plaintiff, Joyce Clinton, and for her claims and causes of action against Defendant, Lincoln National Life Insurance Company, states as follows:

PARTIES

1. Joyce Clinton ("Clinton") is a resident and citizen of the State of Kansas.

2. Defendant Lincoln National Life Insurance Company ("Lincoln") is an out-of-state insurance company authorized to do business in the State of Kansas. The Commissioner of the Kansas Department of Insurance is authorized to accept service of process on behalf of Lincoln.

JURISDICTION AND VENUE

3. Clinton brings her claim pursuant to the Employment Retirement Income Security Act ("ERISA") and 29 U.S.C. § 1001 *et seq*.

4. This dispute is governed by a welfare benefits plan and its policy documents, as well as applicable federal law regarding employer provided benefits. 29 U.S.C. § 1132(e)(1).

5. This Court also has subject matter jurisdiction pursuant to the general jurisdictional statute for civil actions arising under federal law. 28 U.S.C. § 1331.

6. Venue lies in the District of Kansas under 29 U.S.C. § 1332(e)(2), as the breach occurred in this district, and because the welfare benefits plan is administered in this district.

7. Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this action occurred within this judicial district.

## INFORMATION REGARDING TRIAL

8. No jury trial is allowed under ERISA law.

9. Trial is to be held in Kansas City, Kansas.

## STATEMENTS OF FACT

10. Beginning July 2022, PNC Financial Services Group ("PNC") employed Clinton as a Loan Specialist.

11. PNC sponsored a group short-term disability ("STD") and long-term disability ("LTD") benefits plan ("Plan") for its participating employees.

12. The Plan constitutes employee welfare benefit plans as defined by 29 U.S.C. § 1002 (1).

13. The Plan offered disability benefits to qualifying PNC employee Plan participants.

14. At all relevant times, Clinton has been a participant and covered person under the terms of the Plan.

15. PNC is the administrator of the Plan.

16. The Plan's disability provisions are insured by a policy written by Lincoln.

17. PNC delegated or attempted to delegate the function of issuing STD and LTD claim determinations to Lincoln.

18. PNC and Lincoln entered into an administrative services contract through which PNC paid Lincoln for acting as claims administrator.

19. During her employment, Clinton was an "active, full-time employee working in the United States."

20. While employed by PNC, Clinton began to suffer from a number of health conditions, primarily anxiety and depression, but also including mitral regurgitation, tachycardia, IBS with reflux, migraines, post-COVID syndrome, right anterior thigh paresthesia, insomnia, shortness of breath, and heart palpitations.

21. Over time, Clinton's anxiety and depression turned into a full-blown panic disorder causing her to experience multiple panic attacks per day and extreme agoraphobia, which prevented her from leaving her house and caused her to develop intense OCD-like symptoms, including a fear of touching doorknobs.

22. Clinton also became very fearful of sleeping out of the fear that she go to sleep and never wake up, further exacerbating her other mental health symptoms. These conditions eventually rendered her incapable of continuing her job on a full-time, competitive basis.

23. Clinton's occupation required, among other duties, processing moderately complex transactions; identifying and describing issues with risk management; maintaining positive customer relationships; performing at least 2-3 concurrent activities without reducing productivity; and accepting new or radical ideas with an open mind, avoiding snap reactions. Perhaps most importantly, the job does not allow for the ability to work from home.

24. Clinton's employer initially accommodated her severe anxiety/agoraphobia with it's general policy allowing employees to work from home. In May 2024, however, her employer discontinued the ability of employees to work from home.

25. Because her severe panic and agoraphobia was preventing her ability to adequately perform the duties of her job, Clinton's employer decided that she must return to the office or either go on leave or face potential termination. Given the severity of her condition, Clinton decided to go on leave and last worked on May 21, 2024, a move supported by her treating physicians.

26. Following this leave from work, Clinton applied to Lincoln for short-term disability ("STD") benefits and long-term disability ("LTD") benefits.

27. Lincoln approved her FMLA and STD claims until August 22, 2024, their maximum duration, determining that her mental health issues prevented her from performing the duties of her occupation with PNC Financial Services.

28. On May 20, 2024, Clinton was seen by Synergy Complete Healthcare for anxiety and panic attacks. She reported increased stress at work and increased anxiety and panic attacks up to several times per day. Clinton reported headaches, dizziness, sweating in her hands and armpits and under her breasts, shortness of breath, burning in her chest and mid-upper gastric region, pressure in her chest, affected sleep, and hoarseness. Clinton was prescribed hydroxyzine.

29. On June 11, 2024, Clinton saw Dr. Stewart Grote who recorded that Clinton had a long history of panic attacks and anxiety, some difficulty with functioning, such as performing at a constant pace, interacting with colleagues and the public, regulating her emotions, and maintaining attention and concentration. He supported restrictions and limitations

from 5/22 until 8/22. Dr. Grote further recorded that Clinton had trialed Wellbutrin and 3-4 SSRI's without benefit. In review of symptoms Dr. Grote recorded that Clinton had "profound weight loss recently" and sleep abnormalities for years that had never been addressed. Dr. Grote recorded that Clinton had migraine headaches for years about 3 per month, occasional SOB and wheezing, palpitations, and fast irregular hear beat up to 162.

30. On June 19, 2024, Clinton was seen by Synergy Complete Healthcare for follow-up. She reported that she had covid on 4/28 and still had fatigue and issues with activity in her chest. She was on Omeprazole for her stomach.

31. On August 5, 2024, Dr. Stewart Grote saw Clinton and recorded that she has a long history of anxiety and panic attacks, has a range of medical problems such as insomnia, GERD, IBS, sinus tachycardia, mitral regurgitation, asthma, and migraines, and had COVID in 2024. He indicated that she has been taking Ativan and a beta blocker, and he planned to try the addition of BuSpar. Dr. Grote also described that the claimant had reported worsening social anxiety over the past two months to the point where she had had difficulty leaving the house. He said that she felt the BuSpar had not helped and she had not yet tried trazodone, but she had continued using Ativan and Xanax. He provided diagnoses of panic disorder and insomnia and recommended trials of Effexor, Luvox, and trazodone.

32. On August 13, 2024, Lincoln referred Clinton's claim to Lincoln employee Julia M., RN, for medical review.

33. RN Julia opined that "Based on medical available for review the primary disabling diagnosis appears to be anxiety with frequent panic attacks. R&Ls and no activities that require attention to detail or sustained concentration are reasonable and supported

through 8/22/24 due to symptom severity, inability to leave the home, [and] new medications. This will allow time for medications to be therapeutic and be seen for follow up with AP Grote."

34. On October 7, 2024, Lincoln referred Clinton's claim for an internal medical review to Lincoln employee Dr. Kim Foehl.

35. Dr. Foehl opined that restrictions and limitations of any kind were "not supported by the currently available records."

36. This determination is in direct conflict with Lincoln's approval of Clinton's STD claim.

37. Dr. Foehl explicitly refused to consider Clinton's medical conditions of mitral regurgitation, tachycardia, IBS with reflux, migraines, and insomnia in her report stating that they could "potentially have an impact on the claimant's clinical presentation." But that "It is beyond the scope of this clinician's expertise to assess whether or not they may be conditions that are impairing the claimant."

38. Dr. Foehl did not meet with, treat, or otherwise examine Clinton when forming her opinion.

39. Dr. Foehl did not perform a function-by-function analysis of Clintons capacity for work, limitations, restrictions, or physical and mental capabilities.

40. Dr. Foehl did not perform a vocational analysis of Clinton's occupation.

41. Other than a single sentence stating "33yo loan support analyst for PNC Financial Services" Dr. Foehl did not demonstrate that she considered Clinton's occupation when making her determination.

42. Dr. Foehl's review states that "the records do not describe the manner in which her psychiatric symptoms may have led to impairment" and implies that the current records lack "an indication of any impairments in functioning."

43. However, Clinton's medical records are replete with statements from her providers that Clinton's abilities to perform activities of daily living have been severely impaired by her multiple daily panic attacks, including the abilities to work outdoors on her home or in her garden, to independently care for her child, to prepare meals, to clean up after meals, to do her own hair, to clean her bathrooms or vacuum her home, and to engage in any activity outside her home besides doctor visits.

44. Dr. Foehl's report places special emphasis on the fact that "the claimant was not apparently referred to see a mental health clinician (e.g., psychiatrist, therapist) out of any concern about the severity of her psychiatric state or any difficulty in functioning, nor did she apparently seek out such treatment."

45. However, records from Dr. Grote's office show that he has indeed made such referrals. As Dr Grote's APS from December 9, 2024, shows, he has previously asked her to consider some kind of therapy program but he notes that Clinton has declined these opportunities only because her financial situation does not allow her to afford them.

46. Dr. Foehl's report additionally states that "the internist [Dr. Grote] did not provide a clinical rationale for any inability to carry out work activities at her place of employment."

47. However, Dr. Foehl also states that in conversation with Dr. Grote, Dr. Grote stated that "he thinks that the claimant primarily has agoraphobia." Because agoraphobia causes one to generally be afraid of public places such as stores, churches, or workplaces, Dr.

Grote's diagnosis of agoraphobia can't be squared with Dr. Foehl's statement that Dr. Grote cannot provide a clinical rationale for an inability to be in "her place of employment."

48. On October 14, 2024, Lincoln denied Clinton's claim finding that she was not disabled according to the policy and refused to pay her benefits beyond .

49. Following this denial on October 28, 2024, Clinton through counsel requested a copy of her claim file to include all documents relied upon in making Lincoln's determination. In response Lincoln produced a 215-page file which it represented was Clinton's full claim file. Lincoln's claim file was incomplete.

50. Lincoln failed to provide Clinton with the LTD policy that it based its denial on.

51. Lincoln failed to provide a copy of Dr. Foehl's conversation with Dr. Grote.

52. The Plan and Policy articulate the conditions under which a Plan participant is entitled to LTD benefits.

53. The Policy defines the term "Disabled" as follows:

> ***Definition of LTD***
> *For disabilities that extend beyond 91 consecutive calendar days and are considered long term, the definition of disability is as follows:*
>
> ***For the first 24 months (from your LTD Commencement Date):*** *you are disabled if your disability makes you unable to perform the material or essential duties of your own occupation as it is normally performed in the national economy.*
>
> ***After you have been disabled for 24 months:*** *you are disabled if your disability makes you unable to perform the material duties of any occupation for which you are or can become qualified to perform by education, training or experience.*

54. Both ERISA and the Policy itself require such denials to provide specific information, including:

   a. The specific reason(s) the claim was denied.

   b. Specific reference to the Policy provision(s) on which the denial was based.

c. Any additional information required for the claim to be reconsidered, and the reason this information is necessary.

d. If the case of any claim for a disability benefit, identification of any internal rule, guideline or protocol relied on in making the claim decision, and an explanation of any medically-related exclusion or limitation involved in the decision.

e. A statement regarding the right to appeal the decision, and an explanation of the appeal procedure, including a statement of the right to bring a civil action under Section 502(a) of ERISA if the appeal is denied.

55. On April 3, 2025, Clinton appealed Lincoln's denial.

56. In her appeal, Clinton provided medical evidence supporting her disability.

57. On December 6, 2024, Clinton saw Dr. Grote for a follow up and reported persistent panic attacks with minor activities, inability to drive due to dizziness and lightheadedness, feelings of impending doom, worsening anxiety and depressive symptoms, and fear of sleeping. Dr. Grote opined that her frequent panic attacks significantly affected her daily functioning and contributed to avoidance behavior and paranoia. Clinton reported worsening OCD symptoms since September including the fear of touching doorknobs and a pervasive feeling of impending doom affecting her and her family. Clinton was prescribed Vraylar.

58. On December 9, 2024, Dr. Grote opined that Clinton's "psychotic and pseudo-social" impairments continued to leave her experiencing work-preventing panic, shortness of breath, and feelings of impending doom, among other symptoms. Because her condition was severe and her prognosis so poor, Dr. Grote stated that he believed it would take at least 6 more months for Ms. Clinton to significantly improve to the point of being able to

work again. Dr. Grote opined that Clinton required some kind of therapy program, and stated that being able to find and afford a psychiatrist is "her only hope."

59. On February 3, 2025, Clinton was seen by Synergy Complete Healthcare for a follow up. She reported heart issues, feeling out of breath, gastrointestinal issues, ovulation cramps, nail discoloration, and poor sleep.

60. On April 17, 2025, Lincoln again referred Clinton's claim to Genex Services employee Dr. Elbert Greer Richardson.

61. Dr. Richardson did not meet with, treat, or otherwise examine Clinton when forming his opinion.

62. Dr. Richardson did not perform a function-by-function analysis of Clintons capacity for work, limitations, restrictions, or physical and mental capabilities.

63. Dr. Richardson did not perform a vocational analysis of Clinton's occupation.

64. Again, in direct conflict with Lincoln's STD approval and the review of Julia M., R.N., Dr. Richardson opined that there was "no supported level of impairment that translates into restrictions and limitations from 5/22/2024 forward."

65. On April 22, 2025, Lincoln provided Dr. Richardson's report to Clinton's counsel and required a response by May 12, 2025.

66. On April 24, 2025, Dr. Grote directly responded to Dr. Richardson's review. Dr. Grote wrote:

> The response letter by Lincoln Financial demonstrates much arrogance and ignorance. Joyce went to a counselor before she lost her insurance and benefits and before she ever came to me for advice. She can no longer afford to maintain these counseling sessions and obviously cant afford to go to a psychiatrist either but I highly recommend this be done. She was sent by the state who did a limited psychological testing of 20 minutes and then reported that she looked "fine " which is also inappropriate and should be obtained from Joyce to see what that test ie. PHD Scott Schemmel I believe revealed.
>
> Joyce demonstrates significant somatic complaints manifesting in chest pain and palpitations, IBS symptoms and acid reflux that she deals with on a daily basis . The chest pain forced her to go to the ER in March records of which were not sent to me. All these somatic manifestations in my opinion result from severe chronic anxiety disorder c associated panic attack.
>
> Joyce's panic also causes her to be very fearful from taking medicines because of the side effects and ineffectiveness of multiple appropriate treatments to include SSRIs SSNIs and atypical antidepressants. This has manifested in what appears to be a paranoia that may demonstrate more then just a chronic anxiety diagnosis such as a bipolar disorder but again this would require evaluation by a psychiatrist. The PHD psychologist who apparently was just contracted to do testing and not interviewing the patient about her severe anxieties. The state Medicaid office apparently felt was the right thing to do for this patient but in my opinion it was not and gave the impression to the patient that the tester was not interested in her underlying issues.
>
> Finally, Lincoln Federal inappropriately had their evaluator make a decision on their client's psychiatric diagnosis without interviewing her which is not only impossible but very unethical. Their client is in an awful situation that many uninsured people find themselves in. She has chosen to stay at home and suffer rather then overutilizing the healthcare system which in reality has no system set up for psychiatric analysis. It is difficult to see a real psychiatrist even when one has insurance and impossible for a no income single mother such as their client Joyce Clinton.

67. On April 23, 2025, Clinton was again seen by Dr. Grote and reported daily anxiety with frequent panic attacks, fight or flight sensations, and significant distress with panic episodes causing somatic symptoms like chest pain, acid reflux, and IBS. On exam her heart rate was irregular and her lungs had third auscultation findings. Dr. Grote reduced her Lexapro and considered a switch to Fetzima.

68. On April 25, 2025, Clinton was seen by Julia Fields, PMHNP-BC, for panic disorder, depression, agoraphobia, OCD, physical symptoms including derealization, panic attacks while driving, and difficulty maintaining employment due to mental health issues.

69. PMHNP Fields recorded that Clinton experienced panic attacks while driving, sometimes requiring her to pull over or seek emergency medical attention and that these symptoms have led to numerous emergency room visits and ambulance calls. PMHNP Fields recorded that Clinton had to move back in with her family due to these ER visits. PMHNP Fields recorded that Clinton was experiencing derealization and other uncomfortable physical symptoms associated with her mental health conditions. PMHNP Fields opined that Clinton's presentation was consistent with a severe anxiety spectrum

disorder with prominent agoraphobic features, complicated by depressive and obsessive-compulsive symptoms. PMHNP Fields opined that the degree of impairment supported her need for continued psychiatric care, possible pharmacologic intervention, and functional accommodations through her employer and/or disability services. PMHNP Fields suggested psychiatric medication evaluation and management targeting anxiety, OCD, and depressive symptoms, continued psychotherapy with an emphasis on exposure-based interventions and cognitive restructuring, gradual exposure and desensitization strategies for agoraphobia and driving-related panic and consideration of adjunctive treatments such as group therapy or intensive outpatient programming if symptoms persist or worsen. PMHNP Fields continued Buspar, therapy sessions, and suggested cognitive behavioral therapy focused on anxiety and agoraphobia. Clinton was to return in two weeks.

70. On May 12, 2025, Clinton's counsel provided a response and included medical records and Dr. Grote's April 24, 2025, response.

71. Less than 24 hours after Clinton's response, on May 13, 2025, Lincoln upheld its denial of benefits. Lincolns denial did not consider Dr. Grote's comments in response to Dr. Richardson's report, nor did Lincoln attempt to obtain a response from Dr. Richardson after receiving Dr. Grote's letter and additional medical records.

72. Dr. Richarson stated in his report that Ms. Clinton's records did not reflect that she had any impairments with respect to her ability to "perform ADLs."

73. As described above, Clinton's severe agoraphobia and related conditions have significantly impacted her ability to perform activities of daily living. Dr. Richardson even states in his report that "her frequent panic attacks significantly affected her daily

functioning" and acknowledged that Clinton's conditions have resulted in an inability to drive or to leave the house, among other limitations.

74. Dr. Richardson stated in his report that "[Clinton's] level of care is not consistent with the presence of impairing conditions" due to the fact that Clinton is not being seen by a psychiatrist/psychologist and that she has not been "referred to a higher level of care."

75. However, as explained in her medical records, Dr. Grote strongly believes that Clinton needs psychiatric help. In fact, he states that it is her best path forward for recovering. Unfortunately, Dr Grote also explains that Clinton's lack of insurance and finical insecurity has prevented her from being able to afford these treatment options. Dr. Richardon's report ignores this evidence.

76. Dr. Richardson's statements regarding the inadequacy of Clinton's care also directly contradict his later statements that Clinton's medical management is "clinically reasonable and consistent with the apparent level of severity for the reported condition."

77. Though Dr. Grote has communicated to Lincoln that he believes that Clinton "primarily has agoraphobia," the words "agoraphobia" or "agoraphobic" appear only twice across Dr. Richardson's six-page report.

78. Clinton has at all relevant times met the definition of "Disability" under the Plan and is entitled to benefits.

79. Clinton timely appealed Lincoln's denial of her claim for benefits.

80. Clinton has exhausted her administrative remedies and Lincoln refuses to take further action in connection with her claim.

## CAUSES OF ACTION

### COUNT I
### 29 U.S.C. § 1132(a)(1)(B) – WRONGFUL DENIAL OF

BENEFITS

81. Clinton realleges the preceding paragraphs as if fully set forth herein.

82. Clinton is entitled to all unpaid and accrued LTD benefits, as Lincoln:

a. Made an unfavorable decision without substantial evidence;

b. Failed to properly consider Clinton's medical impairments and resulting limitations; and

c. Issued an unfavorable decision that was arbitrary and capricious.

83. Lincoln has not satisfied its obligation to pay Clinton's LTD benefits.

84. Lincoln denied LTD benefits when the applicable medical record supports upholding LTD benefits.

85. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), Clinton prays for judgment against Lincoln for unpaid LTD benefits, attorney's fees, costs, and prejudgment interest.

COUNT II
29 U.S.C. § 1132(a)(3) – BREACH OF FIDUCIARY DUTY

86. Clinton realleges the preceding paragraphs as if fully set forth herein.

87. Under 29 U.S.C. § 1002(21)(A), a fiduciary is one who:

> "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property or such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

88. 29 U.S.C. § 1104(a)(1)(A) describes the fiduciary standard of care:

> "a fiduciary shall discharge her duties with respect to a plan solely in the interest of the participants and beneficiaries and – for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries;

and (ii) defraying reasonable expenses of administering the plan."

89. Lincoln, the Plan's designated claims administrator, is a fiduciary.

90. Lincoln participated in and benefitted from the Plan as previously indicated.

91. Lincoln's claims management practices are motivated by financial incentives in its administrative services agreement with HCA.

92. As the payor of benefits and the entity responsible for exercising discretion in claims administration, Lincoln operates under an inherent conflict of interest.

93. A higher than marketplace quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008) governs the actions of a fiduciary.

94. Lincoln breached its fiduciary duty in:

a. Failing to comply with its internal guidelines and claims handling procedures. Its claim handlers did not comply with documented instructions involving the administration of disability claims, including its procedures involving coverage and eligibility determinations;

b. Refusing to consider evidence fully;

c. Failing to properly administer the claim;

d. Engaging in a structural conflict of interest by assuming the role of both claims administrator and payor of benefits;

e. Failing to properly consider competent medical and vocational opinion evidence, and/or failing to specifically explain why it did not agree with such evidence;

f. Failing to provide a copy of Dr. Grote's peer review response to Dr. Richardson;

g. Failing to provide copies of all documents relevant to Clinton's claim; and

h. Failing to provide a copy of the applicable policy and documents;

95. Lincoln denied Clinton's LTD benefits for the purpose of elevating its financial interests. In doing so, it breached its fiduciary duties.

96. Lincoln failed to discharge its duties solely in the interests of its participants and beneficiaries. It acted with both a conflict of interest and breached its fiduciary duty to both Clinton and the Plan's participants and beneficiaries generally.

97. Lincoln failed to consider Clinton's May 11, 2025 peer review response when issuing its May 12, 2025 predetermined denial.

98. Lincoln's improper conduct demonstrates that ordinary relief under § 1132(a)(1)(B) is not an adequate remedy.

99. Lincoln's violations of regulations alone allow Clinton the right to pursue any remedy under Section 502(a) of ERISA, including § 1132(a)(3). 29 C.F.R. § 2560.503-1(1)(2)(i).

100. Lincoln's violations of federal regulation also subject its decision to *de novo* review.

101. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(3), § 1109, and § 1132(a)(2), Clinton prays for an order that Lincoln retrain its employees consistent with ERISA fiduciary obligations and federal regulations; for reformation of its services agreement with the plan administrator consistent with ERISA fiduciary obligations and federal regulations; for an injunction preventing further unlawful acts by Lincoln in its fiduciary capacity; for an equitable accounting of benefits that Lincoln has withheld; for the disgorgement of profits enjoyed by Lincoln in withholding benefits; for restitution under a theory of surcharge; for pre-judgement interest on wrongfully denied benefits; for the Court's imposition of a constructive trust; for an award of attorney fees; and for further relief as the Court deems just.

Respectfully submitted,

BURNETTDRISKILL, Attorneys

By: */s/ Derrick A. Pearce*
Derrick A. Pearce, KSD#16752
Benjamin Narrell, KSD#79228
103 W 26th Ave., Ste. 290
North Kansas City, MO 64116
P: 816.781.4836
F: 816.792.3634
dpearce@burnettdriskill.com
bnarrell@burnettdriskill.com
ATTORNEYS FOR PLAINTIFF